May it please the Court, Anne King on behalf of Appellant Lori Freeman. Ms. Freeman asked this Court to reverse the District Court's dismissal of her hostile work environment, constructive discharge, and state law obstruction of justice claims against her former employer Dal-Tile. I'll begin with the hostile work environment claims. Over three years, Ms. Freeman, an African-American woman, experienced ongoing racial and sexual harassment from Timothy Koester. Koester worked for Votestone. Pardon me? Ongoing racial? Ongoing racial and sexual harassment, yes, Your Honor. Well, on the racial issue, we had the one incident in 2006 and then we had the two incidents in 2009, right, three years later? That's correct. There were three particularly serious incidents that Ms. Freeman recalls. Well, I was just taking issue with the fact that that was ongoing. Really, we're looking at a 2006 incident where an instruction was issued against this customer not to use those words and he didn't use them for two years or three years. And then in 2009, we had the two incidents about six weeks apart or seven weeks apart. Actually, Your Honor, Ms. Freeman recalls those in particular and highlights those. There was ongoing both sexual and racial harassment by Koester who worked for a company that regularly did business with Dal-Tile. What's the evidence that if you look at the specific ones Ms. Freeman talks about, they're in a compacted period of time. What's the evidence in the record that it was years' worth of conduct by him and how does that make both sexual and racial actions or comments? What's the evidence? Now, not an argument, but the evidence and how does that create the case for Ms. Freeman? There's significant evidence of pervasive harassment through that period. You may have to pull that microphone a little bit closer. I'm having trouble hearing you. You might have to pull that. Oh, of course, Your Honor. The microphone, you can pull it towards you. Okay. How's that? So, Ms. Freeman described an atmosphere where Koester, who came into the office almost every day, made lewd comments as often as two to three times a week. Sarah Renn, the manager of the Raleigh branch, co-workers and Koester, self-echoed that. Wait one second. Let me ask. Is that clear that it's for the three-year period? I believe that that's correct, Your Honor. Do you have a statement that she made that says that? She describes in her testimony where she makes that statement around JA-78-79 that it began when she started as a temp back in 2006, and then she describes an atmosphere where he was frequently making lewd comments a few times a week. And in terms of other evidence, there's much corroborating examples. Let me ask this. It's not alone enough that she knew it. Doesn't the management have to be aware of it? Yes, of course, Your Honor. Where's the evidence that management either was or should have been aware of that incidents that precede these very specific incidents that we're talking about? Where's that evidence by testimony in the record? Here, we think that a jury could conclude that Daltow had both actual and constructive knowledge. All right, let's go with actual knowledge. Go with actual knowledge. Where's the evidence in the record of that? For actual knowledge, there are specific complaints that Ms. Freeman made. In 2006, when Koester first used the word black bitch in her presence, she complained to her supervisor, Sarah Wren, at that time. Later, when Koester made a quite serious comment, used what might be viewed as the most serious racial slur, the N-word, and the phrase N-word with a checkbook, Ms. Freeman, and this was in June 2009, Ms. Freeman immediately complained to her supervisor. Why isn't that an isolated incident in 2006 when he used the term black bitches, and Wren then says don't do it? And then the next thing that I see that she talks, that she refers to, was in maybe 2008 maybe? This was the incident with passing the gas on the telephone. We'll have to talk about that. But a specific N-word comment wasn't until 2009. That's right. That was in 2009. But in the meantime, Wren testified that she observed frequent conduct by Koester. A couple examples, that he bragged about his sexual escapades more than once a month, she said. And that's at J268. That he shared sexually explicit photos on his cell phone in front of, quote, everybody. She also said that she assumed he joked about racial topics. As for other specific dates, the question of explicit photos on the cell phone, Koester recalls that in around, I believe it was the summer of 2008, that he showed Ms. Freeman in particular a photograph of a naked woman's buttocks on his cell phone. She testifies that he basically shoved it in her face and said something like, this is what I left my bed to come here today. So in fact, although we highlight. She complained the second time in July of 2009? First in 2006. Then in June 2009. She instructed the Koester not to say it. And according to her, black bitches wasn't used again for three years. And then it was used again in the summer of 2009. That's right, that in 2006, Ren, the supervisor, told Koester, don't say that again. But it wasn't effective at all. As I just described, Ren witnessed. Well, there's no evidence that he used a specific racial term during the three years. And there's no evidence that she complained about it for three years. She complained in July of 2009, right? June and then July 2009. That's correct. All right. And that led to intervention by the employer. The July 2009 complaint did, but not the June 2009 complaint. But to refer back to a question that you just asked, Judge Niemeyer, there is evidence of other racial comments between 2006 and 2009. They're very generalized. Joking and so forth. My question is, this is an employer liability claim. And the employer was told about a problem in 2006 and took care of it and thought it was taken care of, and apparently it was. Then the employer was told about this in 2009 and responded and concluded that Koester isn't going to come in this place until we sort this out. And after they barred him from that place, they reached an arrangement where he can't talk to her and certain limitations. And there's no evidence of anything further with respect to her after that. So my question really is, you have these two periods, the June and July is when they really addressed it, and the isolated one in 2006. The rest is all, this is not even an employee. The employees had a pretty good camaraderie, and they sort of said, oh, there he goes again. Now, he had this terrible habit of referring to all women in all contexts as bitches. Even in front of his daughter. And every time you see a woman, black or white or anything, you call her a bitch. You go out at night and talk about it as bitches. It was just totally offensive and inappropriate. And all the women in the floor knew that, and they sort of teamed together. They got along pretty well together. And he came in, and he was an offensive customer. So in 2006, they tell him, don't use black bitches. He didn't. And then he did use two phrases in 2009 that were totally inappropriate and violated that earlier instruction. And at that point, after those two phrases, he was barred, right? There are a few things that I'd like to address in your comments, Your Honor. So the final question about when he was barred. He was initially banned after the July 2009 black bitch comment, which is when Ms. Freeman complained to Human Resources. And that's very telling, because the employer, in a case of third-party harassment, is required to take— Let me ask you one part of a question that he asked you. Yes, Your Honor. Judge Nemar said in 2006, when he said black bitches, he was told, don't do that again. Oh, they corrected that. Does the evidence indicate that he stopped doing it at that point? I don't think it does, Your Honor. You don't think that it does? What does the evidence say? A jury could certainly find, based on this record, that he didn't stop engaging in highly offensive conduct. No, no. Did he ever use black bitches again until 2009, in the record? That's not indicated in the record. However, the fact that this admonition in particular didn't stop him from engaging in other offensive conduct means that it was not an effective measure by dole tile. And in fact, he admittedly made comments about his own sexual relationships with African-American women in particular. So there was a racial character to his sexual banter, to his sexual commentary. And another co-worker testified that he used language that was racial in character. Now, Ms. Freeman is an African-American woman. And the Supreme Court has emphasized that the objective standard in determining what's offensive when analyzing house-to-work environment is viewed from the perspective of a reasonable person in the plaintiff's position. Here, the harassment by Coaster should be viewed from the perspective of a reasonable African-American woman. And a jury could certainly determine that his pattern of harassment would be offensive to an African-American woman, regardless of how the other co-workers viewed them. I'd like to just focus on a point about dole tile's response, which Judge Niemeyer brought up. Judge Niemeyer, you had mentioned that dole tile banned Coaster originally after the July 2009 complaint. They could get it sorted out, was the language. Well, we would put forth that a jury could see dole tile's response quite differently. This is a situation where dole tile itself internally initially concluded that banning Coaster was the appropriate corrective action. Kathy Dixa in Human Resources testified that she and the regional vice president had agreed that a ban was appropriate. Your whole argument here, I know where you're going. Your whole argument is that your client assumed that he was banned permanently and turned out that he wasn't. He still did business with the company under a limited basis. But during that period, that readjustment to let him come there and he picked up product on the front steps and this type of thing. The fact that they did that, it never engaged your client then. There was no further racial or sexual comments made by him to her, were there? After the July 2009 comment. In that case, Coaster and Freeman did not make any more offensive comments to Ms. Freeman. However, as I emphasized before, the harassment had persisted for three years before that action was taken. And the failure to prevent contact itself caused real harm to Ms. Freeman. This was harassment that, as I've explained, happened two to three times a week. Your argument is that ending the comments was not, ending the interaction between her and the customer, and therefore ending the comments was not a sufficient response by the employer? Not in this case, Your Honor. And it certainly would make sense for a business that has an abusive customer that comes in regularly and abuses an employee, like has happened here, to ban that person. Ms. Freeman, because the harassment was ongoing, she knew that she could encounter him at any time and also just his presence was very harmful to her. But is your argument there not that the reasonable response would be to ban him permanently? You're arguing that that's the only response. No, Your Honor. I do think that there would have been other possibilities. Do you really think that's a strong suit of your argument about the response? I don't think it boils down to that being the only response, but I think it is helpful to analogize to— Didn't they effectively keep him from doing business or contacting her? Didn't they do that? They did initially and then backtracked after the company worked— No, no, no, but I'm talking about even— —intervened. What, he called her on the telephone one time by accident and quickly hung up? And he also had emailed her as well and came to the—he was sort of incorrigible. Even when told to keep away and not contact her, it didn't work. He emailed her. He didn't know what he was saying. He called her. Incorrigible, that's way too strong a word, isn't it? He called her. The telephone contact was he called there and she answered the phone. He realized it was her and then didn't she say he then hung up politely? I believe that he asked her—he had asked her a question about a specific customer that she worked with, so a jury could conclude that he had called in order to reach her because she had worked with this customer. Your Honors, if there are any more questions about the house-to-work environment claims, I'm happy to answer them, but I also— Let me tell you, here's a problem you have, I think, in this case. Because the specific incidents Ms. Freeman talks about are grouped together and they're over a three-year period. I mean, there's a year's worth of gap between her specific incidents. You have to establish that if you want to succeed, I think. You have to establish that the workplace was hostile and the conduct was pervasive. Your Honor, I think the record does establish that. Well, I know you're saying that, but what's the best evidence you have of that? How many people say it? What have they said about his conduct? What does he say about his conduct? He admits to acting in an outrageous way. In these three incidents that are specifically talked about? More than that. He admittedly made regular racial remarks and jokes. He admittedly made comments about women he had had sexual relationships with, including African-American women. The branch manager said that he bragged about his sexual escapades more than once a month. He called women bitches every time that he came in, according to his co-worker. He didn't say that. He didn't say that. What co-worker said that? Jody Scott. It's at JA 381-82. Well, don't you think those comments and that testimony is critical to your establishment of what the work environment was? I think that is critical. And I think that a jury could view this as an ongoing environment rather than just a series of isolated events. To recall certain events with particularity is actually quite reasonable, given the severity of those events. Didn't Ms. Wren say that he was a pig, describing his conduct? Didn't she say that? I believe she did, Your Honor. What do you mean you believe she did? You don't know the record? I don't have a reference here right here, but I do recall something. Well, didn't Ms. Dixon say? Pardon me, Your Honor. Didn't Ms. Dixon say that Ms. Wren had called him a chauvinist, a pig? Yes, Your Honor. And Dixon also testified that Wren had explained to her that she knew this was an ongoing problem. And that his conduct wasn't new. That his conduct was not something new, I believe is the correct—it was the exact quote. Your Honors, I am out of time for the moment. I would like to reserve my remaining time for rebuttal. Thank you. All right. Let's hear an argument on behalf of the corporation. Thank you, Your Honor. May it please the Court. My name is Christine Sims. I'm here on behalf of Dow Tile. You're going to need to pull that microphone closer, too, please. Thank you, Your Honor. Great. I'd like to address the severe and pervasive, specifically in regards to a hostile work environment claim, in regards to the racial context, and then in regards to the sexual context. I believe that the question coming from the panel today absolutely hits the nail on the head in regards to whether or not Tim Kester, who was not, in fact, an employee of Dow Tile— Let me ask you on that. We've never had a case involving a customer creating a hostile work environment. And I gather the theory of the case has to be that this was an internal, external causation of a hostile work environment that the employer did not address. That's the theory of the case created by some external person. I believe that would have to be— Even though the workplace itself was congenial. I believe, Your Honor, that would have to be the theory of the case. That the workplace was congenial. Now, what's the standard imposed on the employer in that type of a theory? I would argue it's a negligent standard. Do you think there can be a scenario in which a company does ongoing business with a sexual harasser, racist— I'm not saying this person is, I'm saying— so much so that the employer is charged with stopping that conduct in the workplace? I think that— That would be a yes or a no. I think yes, Your Honor, that if it is severe and pervasive, if it hits all of the other factors— Even if it's not, if it's a customer or subcontractor who does business with the employer, you think the employer has some obligation to take steps to end that conduct in his workplace? I do believe that an employer has the obligation to protect its employees, regardless of where the abuse may come from. Now, how reasonable their actions are or when they need to step in may differ. It's a different question. It is a different question. But I do think an employer is required. The employer steps in, the employer's standard for stepping in is a negligent standard. If they knew or should have known of the conduct and didn't protect the employees, then there's liability. I think if they knew or should have known of the harassment, and they did not take prompt and remedial action, reasonable to stop the harassment. I don't think there's a case under Title VII that says the employer must come out first time and absolutely stop the harassment. But what these cases do say is that an employer must take prompt and remedial action. These are cases from other circuits? Well, I think the cases within— We have no case in our circuit on this. You do not? We have no Supreme Court case. There is no Supreme Court case. There is no Fourth Circuit case. We're arguing—I guess Kramer Foods was the first time where you've—the Fourth Circuit, where this court even came close to analyzing the matter, and that was where an employee who was filling vending machines was being allegedly harassed and stalked, according to the allegations in the complaint, by two employees of the hospital. And I think that's probably as close as this court has. But I would argue that the key issue here is, is the conduct severe and pervasive, and can it be imputed to the defendant as the two main issues before this court? I submit the fact that one, no. It seems to me that if you're going to focus on Title VII, we would have to conclude that the employer allowed a sufficient amount of external conduct to come in that was severe and pervasive and altered the terms of employment based on race or sex. In this instance, Your Honor? No, I'm talking about statutorily. I mean, in other words, the statute prohibits an employer from discriminating against an employee by reason of race or sex. And the question is, now the employer and the employee are not the protagonists here. We have a customer who comes in regularly and infuses the workplace with ugly racial and sexual comments, such that the employees find the workplace being hostile when he's in the store. Now, when he's gone, apparently it's not. But whenever he comes in the store, the workplace becomes a hostile place. The question is, under what circumstances is the employer charged with that in protecting the employees under Title VII? I think once the external force rises to the level of a hostile work environment and to where the employer knew or should have known that the employees are offended. It seems to me it has to focus more heavily on the fact that the employer tolerated a condition that changed the employer-employee relationship. In other words, the whole focus of Title VII is the relationship between the employer and the employee. So the circumstances would have to be that there was enough evidence to show that the employer tolerated a condition that changed the workplace in violation of Title VII. I'd have to agree with you, Your Honor. I would have to agree with you. That the employer, in fact, tolerated such behavior that the employer's employees' terms and conditions are affected. Well, what I'm really getting at is whether negligence is the appropriate standard there or whether you would have to show that the employer had actual knowledge sufficient to, and didn't act on it, sufficient to change the workplace. I mean, we're still focusing ultimately on the relationship between the employer and the employees. And in that context, it's not really any different almost when you're looking at a co-worker who's engaging in the harassment, even though that gets it closer, where an employer is only on the hook for harassment of a co-employee or a peer. Well, the employer has a lot more control of employees. He has terms and conditions. He has handbooks. He instructs them and so forth. When you have customers coming in, and we're now policing customer conduct, it seems to me maybe the same result could happen. But the question to me would then be is what level and what knowledge and what standard are we going to impose on the employer? I think the employer must have knowledge that the terms and conditions of the employee-employment relationship has changed for that employee. An abstinence showing by the employee that his or her terms and conditions of employment have, in fact, been affected, have, in fact, been infected by this outside force. But the conduct could be so outrageous that it could affect that. It could alter the employment, correct? That can happen. There could be conduct that rises to that level from an outside force that could alter those terms and conditions. And the company, they can't be free in that kind of scenario because, yes, the customer, but that customer's coming there, and by the way, I would suggest that they only allow that customer to keep coming back and doing that if that customer's making them money. If there was a customer who never did any business with them, did all the business with the competitor, you don't think they would allow him to come in and do stuff and say stuff, do you? Don't you think there's more tolerance for somebody that's making the company money? Is this guy, he must have been because why else would he be tolerated? Well, he was, in this case, Mr. Custer was an independent contractor of Vostone, and Vostone was a very large customer of Dow Tiles. He was an agent of the customer. He was an agent of the customer. And I know how Vostone does the business because when did, why did, is his name Coaster or Custer? I refer to him as Mr. Custer. Me too. Mr. Custer, when he talked about the N checkbook, where did he say that came from? From James Vost. Yeah, it came from my boss. I can't say that I didn't use the N word. I can't deny that. In fact, Liz, I could have made that very comment because I've heard my boss say it. He could neither admit that he said it nor could he deny it. Well, he loses on that if somebody judges him because she said he said it, and he doesn't deny he'd lose anyway, but he doesn't even deny it. So let's go back to this. Why isn't this a pervasive problem at this company? Because in this context, looking at the social context, looking at the totality of the circumstances in regards to race specifically, you have, as discussed previously, the 2006 Black Bitches comment, which was addressed, and Black Bitches did not. No, you have evidence that over the entire period he came in, he used racial comments. He says he said stuff that was not appropriate, and he used sexual comments the entire time. There is evidence. I know that Lori Freeman, the plaintiff in this case, has said that, but Jody Scott, in looking at the totality of what she said, when she said that he used racial comments, when she was given an opportunity to explain, in fact, what she meant, what she said was it isn't that he used the N-word. He was using what she considered racial slang, such as yo or yo-yo. Why is he entitled to the benefit of how that's interpreted? When somebody goes, he used racial language every time he came in, he used sexual language every day. Why is he then entitled when somebody discounts that and goes, but I thought it was kind of funny. How does he get the benefit at summary judgment of somebody declaring that his use of what he says is inappropriate language? It's what he calls. How does he get the benefit of that at summary judgment? I don't know if he gets the benefit of it, but I do think that Daltyle should get the benefit of it because only what they're aware of. No, no, no. How does Daltyle get the benefit of that testimony as not being offensive or sexist or racist or racial? Let me say racial, not racist. How do they get that benefit? The reasonable inference is supposed to go to the other party, not to your company. That is correct. Does your company take the position that using the word bitches sometimes is a good thing? I don't think that it's a good thing, but I don't think that it is necessarily rising to the level of severe and pervasive or meant to be humiliating. If somebody uses bitches in that context in a bad way, in a bad way, then is he entitled to get some belief that the other 999 times or 50 out of the next 100 times he said bitches, he didn't mean anything by it, it was just fun? How does he get that inference off that? When a man comes in shouting how my bitches and here's a bitch I slept with last night, how does he get the inference that that is not, how does he avoid a negative inference in a hostile work case? How does he do that? Because I think in the social context of this stonyard, and I'm certainly not making the argument that stonyards should be treated differently than other employers. I think you're about to give me a way it could be taken. Does it have to be taken that way as a matter of law, that it was just conversational and just fun? How does he get that inference? I mean by him, I mean him, I'm putting him in the place of the corporation. How does the corporation get that inference off language like that? You might can get it, you might convince a jury of that, but how do you get that as a matter of law, that when he sometimes says bitches, that's offensive, but the other 99 times he said bitches, that wasn't offensive. How does he get that inference? Well, in this instance, there were only two reports by Ms. Freeman, and she's the only, the record is very clear that Ms. Freeman is the only person to ever have raised a complaint about Mr. Kester. That's not the only testimony on the record that Mr. Kester said racial comments and used bitches a lot, almost every day. That's what the record is, isn't it? According to Ms. Freeman, she made a generalization. What about Jody Scott? What about Sarah Wren? What about Kathy Dixa? Well, Kathy Dixa has no personal knowledge because she wouldn't have been working at the stone yard. But she testified that Ms. Wren told her he was a pig. That he was a pig and that he was a chauvinist. And so that has something to do with sexual comments. Isn't that an inference that it had to do with sexual comments he made in the workplace? Why else would you call somebody a chauvinist pig based on what? And in this context, and in a fair reading, it's because he used those sexual comments to employees? I'm asking, where else does that come from? What do you think in this context for Ms. Dixa to say, yes, Wren told me he was a chauvinist. He was a pig. What other inference are you entitled to as a matter of law? That he liked pork products? I mean, what are you entitled to? No, I think you can take it as he was a chauvinist pig, just as one would assume it to be taken. That's based on stuff she saw in the workplace. Based on things that she saw in the workplace. But based on her own testimony, she was not, she took him at face value. She wasn't. I know that, but why is she entitled? Why is the company entitled to the management discounting the comments he made that led her to call him a pig? Because in this context, they were all friends, which included Tim Kester in that. I know this, but that is one reading of the facts. But apparently Ms. Freeman was offended by stuff he said. She was offended, but she didn't report it to put the employer on notice. Well, she did report it in 2006. She reported it in 2006. She reported the one incident in 2006. Isn't the record clear? Language, inappropriate language, and I'm calling bitches sexual language. That's what I'm calling it. Why isn't she entitled to the inference from the record when other employees say he did that every day, every time he came in. He says, I did it repeatedly. Probably every time I went in there, I used inappropriate language. Now, I know he wants to discount it and go, yeah, I know, but some of that I was just trying to be cool and call girls bitches. Well, that's fine for him to say it, but why is he entitled to that inference when somebody else says it was offensive to me? You might be right, and you might win this case in front of a jury, and the jury may go, there's evidence that she thought that, but that's not what he really meant. But at this stage, how do you get that inference? I don't believe that her actions indicate that she was offended. She made the report in 2006. It was addressed. It stopped. But if the company knew, I think a fair reading of this record is, Wren knew that. Because remember, Dixon said, Wren told me this was nothing new. And Dixon said, I took that to mean she's company too, that he'd been doing this for a while. Why isn't it then that they have a complaint about him, they know it continues, and they don't do anything about it? But the record also indicates that when Wren learned of the Black Bitches, the July 2009 Black Bitches comment, and Wren was made aware that Ms. Freeman was, in fact, upset or offended by the comment, Ms. Wren's response to Ms. Freeman was, in fact, I did not know that you were offended. I did not realize that you were offended. But what about 2006 forward? She knew then she was offended by that language, and a fair reading of this record indicates, doesn't it, that he continued to use that language from 2006 on through 2009. Why isn't the company charged through Ms. Wren to know that he's still doing it? I know you don't want to read the record that way, but why isn't that a reasonable? I'm just asking. This is summary judgment, correct? That is correct, Your Honor. So why isn't the company entitled to that influence? Because a fair reading of the record also indicates that Ms. Freeman engaged in behavior with Mr. Kester as well, and Ms. Freeman herself admits they were friendly. That might be a good defense to you. That might be a good defense to you. I just don't understand how you get the – it's just a question to me of inferences here. You aren't entitled to any inference. She's entitled to all reasonable inferences. Why? Is she getting them in this case? I think she absolutely has gotten them in this case. Then let me ask you what the district court said. At one point the district court says, and this is at page 616, Wren's testimony regarding Kester's comments is as indicative of non-actionable conduct, and he footnotes. You know this footnote I'm talking about. And he goes, for example, this is the judge saying, Wren's testimony could be construed to mean that Kester made comments about a particular woman being funny, intelligent, or kind. Now that's the inference the judge picks up in the record, but this is what the actual record said. This is what the record said. Did Kester make a comment about that picture on one occasion? Yes. What was that comment? Who are those black chicks? I would do both of them. Okay, did he say things like that on other occasions? He always made comments about women. Now, by the way, it's pretty fair to me that the context of he always made comments about women there, at least a reasonable inference is, he made sexual comments. The judge picks that up and goes, he could have just been saying they were funny, intelligent, or kind. Do you think she's not entitled to a reading from that, as an example, from that testimony? I don't want to be crass, but what do you take that as? Who are those black chicks? I would do both of them. Do means I think they're kind, I think they're intelligent. Don't you think that's at least a reasonable inference that that is a sexual comment he's making? I'm asking you. I think that's at least one. It could potentially be one inference. They would be entitled to that, wouldn't they, if it's a reasonable inference? Limited specifically just to that sentence. They may not be entitled to have an inference that that creates a hostile work environment. In other words, this is a customer. These aren't the employees doing day in and day out, and the employees took them with a grain of salt. They all bantered with them, and if they didn't feel it was hostile and didn't report it as hostile, except for that 2006, and that was taken care of, it's very hard for me to think that the questions Judge Shedd are pointing to you are imputable to the employer that there's a hostile work environment when none of the employees are complaining. If the employer is unaware that the employees are offended. These aren't employees. This is a customer. So you have an employee going around and calling on the road to have 15 customers, and one customer, every time she goes into that customer's place of business, he's offensive. And she can go back to the employer and say, I don't want to deal with that man anymore. He's offensive. But that hardly, there's nothing to suggest the employer made her go there. And as a matter of fact, as soon as they found out she was offended, each time they addressed her problem. But the pervasiveness in the workplace seems to me you're going to have to have more than just find offensive conduct. And this is an individual customer, one of numerous, I assume. And he's offensive. He's coarse. He's inappropriate. And if the workplace was adversely affected and changed and the employer knew about it, that's one thing. But I don't think just saying these are all sexual comments. They all took them as sexual. And I don't think in this case, as you've indicated, Your Honor, it is in fact impudent. Let me suggest to you. Did you think my question to you about a reasonable inference had anything to do with the relationship between the, anything to do with the company's liability for a customer? You didn't think that, did you? Well, I believe. No, no. I asked you did you think that? When I asked you was that comment, could that comment be taken reasonably as a sexual comment? You didn't think that had anything to do with the relationship between the customer and the company, did you? I think it. I didn't ask you. I said what you thought my question had to do with. I thought you were asking specifically about Tim Kester's comment. Whether that comment could be taken as a sexual comment. And I think that there could be an inference that it could, but I don't think ultimately it's imputed to the employer in this case. Well, that's fine. You can answer his question about that. I asked you my question. And by the way, imputing to the company, who made that statement about he always makes comments? If that statement, he always makes comments in that context, can be taken as a sexual comment, and I thought you just said, by the way, I don't think this is any leap of faith on your part. Can't that be taken as a sexual comment? That single comment could be. Right. That one isolated comment. And Wren is the one who said he made those comments. So that's certainly, that comment and knowledge of that comment is imputable to the company, isn't it? Because she knew it. Isn't she management? She was a supervisor at the location. You don't deny that she's management, do you? You're correct, Your Honor. She was a manager. So at least then, and I didn't cite that for the legal theory on whether or not a customer can cause liability on the part of the company. You have said that a customer can. Now, whether or not it does in this case is something different. But haven't you said, I know the answer, and I'm going to ask you again, you've said that if a customer conduct was bad enough, you think, yes, the company has to do something about it. That's what you said. That is correct. If a customer's conduct is bad enough to change the terms and conditions of the employment relationship, the employer should step in. But I was pointing out to you, I still have the question about reasonable inferences and who's entitled to them. And I suggest that perhaps on occasion, if not more than one occasion, the district court gave the inference to the company and not to the non-moving party. Let me ask you another question about the judge's order. Is your company policy that if somebody feels like they're harassed, they ought to speak to a manager? That is one way that they may address the harassment. Do you think that Ms. Freeman, on the occasion she reported the conduct to Ms. Wren, was following company policy? She complained to Ms. Wren. Is there any question about that? That's appropriate, isn't it? The first time, she asked simply, who is that guy and what is he doing? But she talked to Wren, didn't she? She did talk to Wren on all three occasions, the 06 and the 209. And that is whether you call it a complaint or not, if you have a concern or question, your company policy is you ought to talk to your supervisor or somebody in management, right? That is one avenue, yes. And you think what Ms. Freeman did was appropriate, correct? Did she follow your company policy in talking to Ms. Wren? I believe in the third instance where she made an actual complaint, yes, she did. If you have trouble answering that, you're going to have a lot of trouble answering the rest of my questions. Didn't she do right? Was it Wren, her supervisor? Yes, Wren was her supervisor. I don't know why it's taking so long to get to the answer to this. Listen, your policy is if you feel you're being discriminated against, immediately bring the matter to the attention of management. Wasn't Ms. Wren management? Yes, Ms. Wren is management. Right. Once Ms. Wren did that under your company policy, does she have any obligation to report it to anybody else under your company's policy? Under your company's policy? Not under the company policy, but there have been cases that have established if the employee does not believe that he or she has gotten an adequate response, then it is unreasonable to not avail themselves of the other options under the policy. And in this case, Ms. Freeman did that. And she did it, didn't she? In the July 2009 instance. She went to Ms. Bixon, didn't she? That is correct. What do you make of the court and these specific facts when the court says, this is page 623, further, even if the court were to assume arguendo that the above reference remarks that the plaintiff made to Wren could somehow be construed as complaints, it is undisputed the plaintiff knew there were additional avenues that she could pursue if she was unsatisfied. But did your company take any solace in that? Didn't Ms. Freeman do what she was supposed to do? She had a complaint or concern. I'm not resting on that word. She was concerned about something that happened in the workplace, some language or some treatment, and she went to Wren, right? And in 2006, Wren addressed the issue and black bitches was not mentioned again until 2009. You're not answering the question. You're talking about something else. So what do you make of the fact that the court discounts her conduct by suggesting she should have done something else? Because there have been cases, I'll bet not out of the Fourth Circuit, not out of this court, that have said if an employee is not satisfied with the response or in this case Ms. Freeman said she didn't feel like she was being heard by the court. Let me ask you this much. Did Ms. Freeman follow company policy when she had these concerns? In 2006 and really 2008 too, but we'll talk about the passing gas on the telephone. That's something different. In 2009 twice, didn't she do what the company policy said to do? She went and talked to Wren about it. Well, she asked a question in 2006. She repeated the checkbook comment in 2009 and made a complaint. Did she talk to Wren about it in 2006? Who'd she talk to when she said? The conversation that she had was with Wren. Who is that guy and what's his deal? That was to Wren. That was to Wren. Okay. You're the one arguing with yourself about that, but she followed company policy. When it got to the point she felt she had to do something, she followed company policy, didn't she? She followed company policy. Okay. All right. Thank you very much. Thank you. Ms. King. I'd like to first touch on a point that Judge Niemeyer brought up about the standard here. As we agree with Apelli that a negligent standard applies, and this court did apply one in Kromer Foods and cited a number of other circuits that adopted that standard as well as EEOC guidance. There's also a second and a first circuit case, cases more recently, Summa v. Hofstra, 708F3-115. What would be the negligence here and how would that be applied to the corporation? The standard here is whether the negligence standard is whether the employer knew or should have known of the harassment and whether it failed to take appropriate corrective action. I know what the standard is. How does it apply here? Here, touching on something mentioned earlier, the idea that Daltile tolerated Coaster's harassment is very squarely supported by the record, and we believe a jury could find— How is that supported by the record? They knew about—tell me how you build that case based on the record. The testimony of Wren in particular very much points in that direction. For example, the conduct that she witnessed herself was in many cases so objectively harassing, such as sharing of pornographic photographs by Coaster in the workplace, something that directly violated Daltile's anti-harassment policy. Another example is the N-word in checkbook comment. A jury could very easily believe that— They did something about that. The company did something about that. They didn't do something about it immediately, Your Honor. How long did it take them before they did something about it? Ms. Freeman had reported that to Ms. Wren directly after it occurred. That's June 2009. The company didn't begin an investigation until another report at the end of July 2009. I just wanted to make one other comment about the nature of the sort of clear offensiveness of the conduct and that it's something that a jury could believe that a company wouldn't tolerate from a customer. This court has pointed out in the Oakletree decision that an employer can't avoid Title VII liability using a hear-no-evil, see-no-evil approach, and a jury could conclude that that is what occurred here, that Daltile— You have to base it on facts and the record, though. You have to base it on facts and the record. By the way, the comment about the checkbook and all that, that was in June and July of 2009. If you're not careful, you get caught on— Just as a matter of theory, I mean you get careful, you get caught. That's just a couple specific instances, and you may fall into stray actions or stray comments. You have to establish that it was pervasive and ongoing for a long period of time. Well, the checkbook comment itself could be viewed by a jury as sufficiently severe on its own to constitute a house-to-work environment, but that wouldn't be a necessary conclusion to find that there was a severe or pervasive environment based on the other examples of testimony about Koester's racial and sexual comments. What's the strongest two pieces of evidence from the record you have that the—Koester's conduct was—from which you get the reasonable inference that it was offensive and that it was ongoing from, say, 2006 forward? What evidence do you point to specifically? I think sort of a combination of both Wren and Koester acknowledging that he regularly made comments about his sexual escapades. I think Wren called them his evening excursions. And also the— Is that dated? Do we have a date for that, when that occurred? Well, it happened throughout the period. I know that, but you just can't say it happened throughout the period. Did they put a date on that? I don't know that there's a specific date because it was many occasions, Your Honor. And in terms of a second piece of evidence, I think the fact that a co-worker, Jody Scott, said that Koester used the word bitches every day, every time he came in, is also very compelling because that's quite an offensive term and it was on such a regular basis. She said that he did say, How's my bitches, every time that he came in. Correct. Why isn't how's my bitches? Why isn't that just an acceptable greeting in the world of commerce these days? Well, I think that a jury could very easily view that as far from acceptable, Your Honor. Yo, bitches, how's my bitches as a greeting in a business place Because you think that puts a woman in an inferior position to the man walking in and calling them bitches. Yes, I think that's correct, Your Honor. I think that's at least a reasonable inference. Yes, I do agree with that, Your Honor. Are there no further questions? Thank you. Okay. Thank you.
judges: William B. Traxler, Jr., Paul V. Niemeyer, Dennis W. Shedd